**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 13-cv-2127-WJM-NYW

CITIZEN AWARENESS PROJECT, INC.,

Plaintiff,

v.

INTERNAL REVENUE SERVICE, an agency of the United States of America, and UNITED STATES OF AMERICA,

Defendants.

---

**ORDER GRANTING SUMMARY JUDGMENT IN PART AND DENYING IN PART**

---

Plaintiff Citizens Awareness Project, Inc. ("CAP") sues the Internal Revenue Service ("IRS") for what the IRS admits was an unlawful disclosure of a confidential tax form filed by CAP. The parties' only significant dispute is the amount of damages the IRS owes to CAP.

Before the Court is the IRS's Motion for Summary Judgment. (ECF No. 43.) For the reasons stated below, the Court grants summary judgment in part and denies it in part. Specifically, the Court finds that CAP has stated a potential claim for actual damages of up to $4,819.78, although the precise amount must be determined at trial. CAP's claim for punitive damages fails as a matter of law.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).[1]

---

[1] It perhaps bears noting that this case will be tried to the Court, rather than to a jury. (*See* ECF No. 56 (setting a bench trial).) In such a circumstance, some circuits allow their district courts to make factual findings at the summary judgment phase if the court can confidently say that presentation of live evidence would make no difference. *See, e.g.*, *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003); *Matter of Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991); *Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 400–01 (1st Cir. 1988). Other circuits hold that the summary judgment standard remains the same regardless. *See, e.g.*, *Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Technical Sch.*, 817 F.2d 1310, 1315 (8th Cir. 1987); *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967). As far as this Court could locate, the Tenth Circuit has never addressed this question directly, but it appears to lean in favor of the latter view. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 949 (10th Cir. 2002) ("Although a district court can make factual findings related to laches after a bench trial, the court should not make factual findings when addressing a summary judgment motion based on laches . . . ." (citation omitted)). This Court will therefore apply the same summary judgment standard it would apply if the case was set for a jury trial. The Court notes the IRS's contention that "no further evidence would come forth at trial" because all witnesses but one "are outside the Court's subpoena range." (ECF No. 47 at 3 n.1.) However, even if true, the Court is aware of no authority that would permit it to make factual findings, credibility determinations, etc., based on the paper record alone.

When, as here, "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden on a motion for summary judgment by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotation marks omitted). If the movant meets this burden, the burden shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671 (internal quotation marks omitted).

## II. FACTS

The following facts are undisputed unless otherwise stated.

In October 2012, CAP submitted an IRS Form 1024 application to be recognized as § 501(c)(4) organization, *i.e.*, a tax-exempt "organization[] not organized for profit but operated exclusively for the promotion of social welfare." 26 U.S.C. § 501(c)(4)(A). (*See* Movant's Statement of Material Facts ("Defendant's Facts") (ECF No. 43 at 2–11) ¶ 1.) Forms 1024 are considered confidential unless and until the application is approved. (*Id*. ¶ 16.)

In November 2012, a reporter for the media outlet ProPublica requested publicly available Forms 1024 for 67 organizations, including CAP. (*Id*. ¶ 3.) Prior to this time period, an IRS office in Cincinnati handled this type of request. (*Id*. ¶¶ 11, 13.) At the time of ProPublica's request, however, the IRS was attempting to transition requests from media organizations to its Washington, D.C., office. (*Id*. ¶ 13.)

"There was a lot of confusion in this transition." (*Id.* ¶ 15.) The details of that confusion are largely irrelevant. The upshot is that, despite intended policies that would likely have routed ProPublica's request to a Washington, D.C., employee (and perhaps to higher levels of IRS management), the request ended up on the desk of Cincinnati tax examining technician Sophia Brown. (Defendant's Facts ¶ 7; Statement of Additional Disputed Facts ("Plaintiff's Additional Facts") (ECF No. 46 at 12–19) ¶¶ 36–40, 42–44.)

Brown had never handled a request from a media organization before, nor had she handled a request as large as ProPublica's. (Response to Movant's Material Facts ("Plaintiff's Response") (ECF No. 46 at 1–12) ¶ 10(a); Plaintiff's Additional Facts ¶ 47.) But she had been handling requests for copies of Forms 1024 (other than from media organizations) since 2006, and the disclosure standard is the same regardless of whether the media or some other individual or entity requests a Form 1024: if it has been approved, it can be released; otherwise, it remains confidential. (Defendant's Facts ¶¶ 9, 16.)

When processing ProPublica's request specifically as to CAP, Brown checked various databases for information about CAP, including databases that she should have known were irrelevant. (Defendant's Facts ¶¶ 22, 24; Plaintiff's Additional Facts ¶¶ 51–52, 54–57.) From one of those databases, she printed CAP's Form 1024. (Defendant's Facts ¶ 23; Plaintiff's Response ¶ 21(a)(iii).) She failed to heed a report showing that CAP's Form 1024 had yet to be approved, and so CAP's printed application—along with eight other still-confidential Forms 1024—ended up in a group of materials sent back to ProPublica. (Defendant's Facts ¶¶ 25–26; Plaintiff's

Response ¶ 25.) The IRS concedes that this disclosure was unlawful, but the parties agree that Brown did not make the disclosure intentionally. (ECF No. 43 at 1; Defendant's Facts ¶ 27.)

On December 14, 2012, ProPublica published an article about some of the information it had learned from the improperly disclosed Forms 1024. (Defendant's Facts ¶ 39.) This article did not mention CAP. (*Id.*) Nonetheless, the article appears to have alerted the IRS to its improper disclosure, because on December 17, 2012, the IRS telephoned CAP to inform it of the problem. (*Id.* ¶ 52.) Specifically, the IRS telephoned Charles Smith, who was CAP's Chairman and also, somewhat confusingly, its outside counsel (employed by a law firm that billed CAP for Smith's time). (*Id.*; Plaintiff's Response ¶ 56; ECF No. 46 at 23.) Smith informed the other members of CAP's board about the unlawful disclosure. (Defendant's Facts ¶ 52.)

On January 2, 2013, ProPublica published a second article based on what it had learned from the improper disclosures. (*Id.* ¶ 40.) Again, this article did not mention CAP. (*Id.*)

On March 26, 2013, the IRS sent CAP a letter stating that it needed more information before it could make a decision on CAP's Form 1024. (Plaintiff's Response ¶ 46(j).) Smith spent several hours, both as CAP's Chairman and its outside counsel, responding to this request. (Defendant's Facts ¶¶ 55–56; Plaintiff's Response ¶¶ 55–56.)

On May 13, 2013, ProPublica released a third article ("May 13 Article" or "Article"). *See* Kim Barker & Justin Elliott, *IRS Office That Targeted Tea Party Also*

*Disclosed Confidential Docs From Conservative Groups*, ProPublica (May 13, 2013, 5:40 p.m.), http://www.propublica.org/article/irs-office-that-targeted-tea-party-also-disclosed-confidential-docs (last accessed May 1, 2015).[2] Bearing the series title "Buying Your Vote [¶] Dark Money and Big Data," the May 13 Article highlighted ProPublica's previous efforts to "show[] how dozens of social-welfare nonprofits [*i.e.*, § 501(c)(4) organizations] had misled the IRS about their political activity on their applications and tax returns." *Id*. The Article went on to describe ProPublica's regular practice of requesting IRS information on these groups, and how ProPublica had received a batch of documents that should not have been released yet. *Id*. Those documents included Forms 1024 from § 501(c)(4) applicants "that had told the IRS that they wouldn't spend money to sway elections" but "ended up spending more than $5 million related to the [2012 presidential] election." *Id*. The Article then noted: "The IRS also sent ProPublica the applications of three small conservative groups that told the agency that they would spend some money on politics: [CAP], the YG Network and SecureAmericaNow.org." *Id*. This was the Article's only mention of CAP. *See id*. Although ProPublica published some of the wrongfully disclosed Forms 1024 on its website, it never published CAP's Form 1024. (Defendant's Facts ¶ 44.)

Both before and after the May 13 Article, Smith (as CAP's attorney) had been researching possible remedies against the IRS. (ECF No. 43-7 at 5–6.) After the Article, Smith spent several hours in his role as Chairman doing media interviews,

---

[2] The parties have not provided a copy of this article as it appeared at or near the time of publication. They have only given the Court the above-cited URL. The Court assumes that the article remains in substantially the same form as it was when originally published.

believing that the ProPublica article was harmful to CAP's reputation and might therefore scare away donors and other supporters. (Plaintiff's Response ¶ 59.)

On July 25, 2013, the IRS approved CAP's Form 1024, thus making it lawfully available to the public. (Defendant's Facts ¶ 45.) CAP filed this lawsuit on August 8, 2013. (ECF No. 1.)

Additional facts are discussed below as relevant to the various issues.

## III. ANALYSIS

The IRS admits that it is liable for disclosure of confidential tax information in violation of 26 U.S.C. § 7431(a)(1), but the IRS disputes CAP's claimed damages. By statute, CAP's damages must be calculated as follows:

> (1) the greater of—
>
> (A) $1,000 for each act of unauthorized inspection or disclosure of a return or return information with respect to which such defendant is found liable, or
>
> (B) the sum of—
>
> (i) the actual damages sustained by the plaintiff as a result of such unauthorized inspection or disclosure, plus
>
> (ii) in the case of a willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence, punitive damages, plus
>
> (2) the costs of the action, plus
>
> (3) . . . attorneys fees . . . if the plaintiff is the prevailing party (as determined under section 7430(c)(4)).

26 U.S.C. § 7431(c). The parties' current dispute revolves mostly around CAP's claims to actual and punitive damages. The Court will address each topic in turn.

**A. Actual Damages**

1. Attorneys' Fees

a. *Attorneys' Fees as "Actual Damages"*

As noted above, 26 U.S.C. § 7431(c)(3) allows a prevailing party to recover its attorneys' fees. CAP, however, claims certain attorneys' fees as "actual damages" under § 7431(c)(1)(B)(i), rather than as prevailing party fees. (ECF No. 43-7 at 2.) Specifically, CAP claims $2,700 in attorneys' fees billed by Smith in his capacity as CAP's outside counsel. (*Id.*; *see also* ECF No. 46 at 23.)

Normally, attorneys' fees are not a proper item of damages. *See, e.g.*, *Emp'rs Reins. Corp. v. Mid-Continent Cas. Co.*, 358 F.3d 757, 766–67 (10th Cir. 2004). But exceptions to this rule exist, as illustrated by a case on which CAP relies, *National Organization for Marriage, Inc. v. United States*, 24 F. Supp. 3d 518 (E.D. Va. 2014) ("*NOM*").

*NOM* involved the IRS's Form 990, which tax-exempt organizations must file yearly listing donors who have contributed $5,000 or more. *Id*. at 520. Although filed Forms 990 are available to the public, the IRS must redact donor names and addresses before releasing them. *Id*. at 521. In *NOM*, the plaintiff's Form 990 for the year 2008 was released without such redaction. *Id*.

Based in part on that donor list, one of the plaintiff's ideological adversaries "filed a complaint with California's Fair Political Practices Commission ('FPPC'), alleging that [the plaintiff] violated various state election laws during 2008." *Id*. The plaintiff "hired legal counsel to protect the confidential donor information . . . and ultimately . . . was

absolved of any wrongdoing." *Id*. The plaintiff spent "$12,500 in attorneys' fees in connection with its response to the [FPPC] lawsuit . . . ; and $46,086.37 in attorneys' fees expended during its efforts to determine the source of the disclosure and prevent further dissemination of its [donor list]." *Id*. at 528–29. The plaintiff sought recovery of these amounts as "actual damages" under § 7431(c)(1)(B)(I), rather than as prevailing party fees. *Id*.

The court in *NOM* analyzed this claim under the traditional tort causation analysis of "actual and proximate cause." *Id*. at 529. As for actual ("but for") cause, the court concluded that the fees claimed as damages "were plainly a direct result of this disclosure." *Id*. at 529. As for proximate cause, the court concluded "it was certainly foreseeable that releasing [the plaintiff's Form 990] to a member of the media could result in its publication, and that [the plaintiff] would take legal action to prevent further harm." *Id*. at 530. The court therefore awarded the claimed fees as actual damages. *Id*. at 531.

Although not saying so explicitly, *NOM* appears to be applying two well-supported exceptions to the general rule that attorneys' fees should not be claimed as damages. First, in allowing the "$12,500 in attorneys' fees in connection with its response to the [FPPC] lawsuit," *id*. at 528, *NOM* reflects the following principle, sometimes known as the "tort of another" doctrine:

> It is generally held that where the wrongful act of the defendant has involved the plaintiff in litigation with others or placed him in such relation with others as makes it necessary to incur expense to protect his interest, such costs and expenses, including attorneys' fees, should be treated as the legal consequences of the original wrongful

> act and may be recovered as damages.

*Vallejos v. C. E. Glass Co.*, 583 F.2d 507, 513 (10th Cir. 1978) (quoting *Dinkle v. Denton*, 359 P.2d 345, 349–50 (N.M. 1961), and affirming district court's application of this principle under New Mexico law) (internal quotation marks omitted); *see also* Restatement (Second) of Torts § 914(2) (1979) ("One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action."). In *NOM*, the IRS's "tort" (*i.e.*, unlawful disclosure) forced the plaintiff into FPPC litigation, in turn forcing the plaintiff to incur attorneys' fees to protect its interests. Thus, they were "actual damages" vis-à-vis the IRS.

Closely related to the tort of another doctrine is a more general rule that permitted the plaintiff in *NOM* to recover the "$46,086.37 in attorneys' fees expended during its efforts to determine the source of the disclosure and prevent further dissemination of its [donor list]." *NOM,* 24 F. Supp. 3d at 528–29. These attorneys' fees were not incurred in defending against litigation brought by a third party. Instead, the plaintiff needed certain services to mitigate ongoing damage and prevent further damage, and those services happened to be legal services. In this context, the fees charged for such mitigation and prevention are no different than the fees charged by any other service provider reasonably needed to prevent further damage. As long as those services were indeed reasonably necessary, they are recoverable as damages:

> (1) One whose legally protected interests have been endangered by the tortious conduct of another is entitled to

> recover for expenditures reasonably made . . . to avert the harm threatened.
>
> (2) One who has already suffered injury by the tort of another is entitled to recover for expenditures reasonably made . . . in a reasonable effort to avert further harm.

Restatement (Second) of Torts § 919.

With these principles in mind, the Court turns to CAP's claim for attorneys' fees as damages, which can be broken into two main categories: fees connected directly to the erroneous disclosure, and fees connected to the IRS's request for additional information.

b. *CAP's Attorneys' Fees Connected Directly to the Erroneous Disclosure*

CAP claims that the following time entries relate directly to the erroneous disclosure and should be counted as actual damages in the same way that *NOM* counted attorneys' fees as actual damages:

- 12/17/2012 - Call from IRS regarding potentially stole[n] 1024; email board regarding situation; $33.33;
- 2/25/2013 - Call with IRS agent regarding 1024 application. Review and requests for additional information. Review letter from FEC regarding EOY.; $33.33;
- 5/14/2013 - Call with IRS regarding letter regarding 1024 disclosure, call with Shaun Boyd, strategize with JZ regarding tax scandal, call with Congressman Gardner regarding IRS situation, Emails with EE regarding FOIA request; $633.33;
- 5/16/2013 - Research Z-Street lawsuit and federal statutes regarding IRS scandal and determinations as to tax exempt status, research existence of conservative organization who dropped 1023

applications for purposes of filing federal suit, Research Simmet v. BOP; $233.33;

- 5/21/2014 - Research Norcal TP vs. IRS suit, read complaint, research privacy act of 1974; $266.67; and

- 5/31/2013 - Call Torchinsky regarding on lawsuit, research 26 USC 7431 and cited statutes.; $100.

(ECF No. 46 at 23 n.1 (alteration in original).)[3] Contrary to CAP's position, these entries have little similarity to the fees allowed as damages in *NOM*. With the possible exception of the entries for 12/17/2012 and 5/14/2013 (discussed below), all of these entries appear to reflect time spent preparing for *this case*, not time spent in damage control or fending off some other lawsuit.

It is not enough for CAP to claim that "[t]here are no billing entries which refer to Smith drafting the complaint in this matter." (*Id*. at 24.) If the time was spent by Smith familiarizing himself with the area of law and potential actions against the IRS, it is either: (a) compensable as part of prevailing party fees, *see, e.g.*, *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 n.5 (2d Cir. 1983) (attorneys' fees for "background research" were compensable as prevailing party fees under the circumstances because it assisted the attorneys to "establish[] a new branch of specialization, one in which only a handful of attorneys had preceded them"); or (b) not compensable at all because it is the sort of thing "that would be absorbed in a private firm's general overhead and for which the firm would not bill a client," *Ramos v. Lamm*,

---

[3] The actual billing records are found at ECF No. 43-7 at 4–7, but they are very difficult to read due to formatting problems (*e.g.*, lack of spaces between words, overlapping characters). The Court will therefore rely on the above-quoted transcription from CAP's response brief.

713 F.2d 546, 554 (10th Cir. 1983), *disapproved of on other grounds by Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711 (1987). Either way, it is not compensable here as actual damages.

Concerning the entries for 12/17/2012 and 5/14/2013, CAP claims "it was in [Smith's] capacity as CAP's attorney, and on his [law firm] office phone, that [he] fielded the two phone calls from the IRS relating to the Disclosure on [those dates]. But for the Disclosure, these calls would have never been made." (ECF No. 46 at 23.) The IRS appears to concede this. (*See* ECF No. 47 at 21 (arguing that "the bills make clear that the singular focus of the attorney's work here (*save one or two brief phone calls*) was the research and preparation of this suit" (emphasis added)).) The Court agrees that these fees were imposed directly by the IRS's wrongful disclosure and are of the type that could have reasonably been foreseen. *Cf. NOM,* 24 F. Supp. 3d at 528–31. Thus, the entirety of the 12/17/2012 entry ($33.33) may be classified as actual damages, including the time Smith spent e-mailing CAP members to inform them of the call.

The 5/14/2013 entry is more complicated. The time spent on the call from the IRS will be classified as actual damages, but Smith's billing records do not break out the time spent on that call, and the remainder of the time entry reflects tasks that cannot be designated as actual damages. Accordingly, the record is insufficient to determine what amount of the $633.33 billed on 5/14/2013 can be designated as actual damages. This issue must await trial.

c. *CAP's Attorneys' Fees Connected to the IRS's Request for Additional Information*

The remainder of CAP's attorneys' fees were billed in response to the IRS's March 2013 request for additional information. Whether CAP may claim these fees as damages turns on whether the request was caused by the wrongful disclosure, or was something that would have happened anyway—considering that "such requests [are] commonplace," as CAP admits. (ECF No. 46 at 25.)

There is certainly a factual dispute on this issue; the question is whether it is substantial enough to require a trial. The request came from an IRS employee named Grant Herring. (Defendant's Facts ¶ 47.) At his deposition, Herring testified that, at the time he was working on CAP's Form 1024, he was unaware of any Forms 1024 being wrongfully disclosed save for one instance when one of the filers with whom he was communicating (not CAP) volunteered that information to him. (*See* ECF 43-6; *see also* ECF No. 47-2.) The IRS stands on that testimony.

CAP tells a more complicated story. CAP notes that various more-senior officials at the IRS knew that some Forms 1024, including CAP's, had been wrongfully disclosed, leading to a meeting to discuss "the status of these applications." (Plaintiff's Response ¶¶ 46(a)–(c) (internal quotation marks omitted).) Nine days after that meeting, an IRS employee named Ronald Bell accessed CAP's file, "made . . . a case grade change[,] and submitted CAP's Application 'for managerial review.'" (*Id*. ¶ 46(d).) CAP does not explain the significance of these changes, but the parties agree that Herring e-mailed Bell about a month later asking, "Do you have some Advocacy cases for me? Five would be good." (*Id*. ¶ 46(e).) Bell responded by assigning certain files,

including CAP's, to Herring. (*Id.*)

Herring began working on CAP's file and drafted a half-page request for additional information. (ECF No. 46-15 at 5.) Herring's draft request was generic, not referring to anything specific about CAP's application but seeking, *e.g.*, a "[l]ist[ing] of all your programs and activities to date" and "copies of all materials, in whatever medium, you have distributed to the public." (*Id.*) Herring sent his draft to Hilary Goehausen, a tax law specialist in the IRS's Washington, D.C., office. (Plaintiff's Response ¶ 46(g).) Goehausen replied about a month later with proposed revisions that transformed Herring's half-page into a page-and-a-half. (ECF No. 46-16 at 6–7.) Goehausen's revisions added much more specificity, noting particular aspects of CAP's application (*e.g.*, "You stated in your Form 1024 that you will advocate for center-right policy solutions . . . .") and asking in itemized fashion for a copy or description of essentially every public interaction or communication CAP has ever had, as well as asking for a detailed description of all political expenditures. (*Id.*) This became the request for additional information that the IRS sent to CAP. (Plaintiff's Response ¶¶ 46(i)–(j).)

According to CAP, "the aforementioned facts create a genuine issue of material fact as to whether CAP's Application being brought to the attention of IRS officials, as a result of the Disclosure, resulted in Bell's case grade change, Goehausen's expansion of Herring's request for additional information, and the submittal of the more extensive [request for additional information]." (ECF No. 46 at 25.) The Court finds, however, that this theory does not hold together on the evidence presented. CAP offers no evidence that Bell knew about the wrongful disclosure of CAP's application or that such knowledge, if it existed, affected him in any way. CAP offers no evidence of what it

means for Bell to make a "case grade change," whether Bell was directed to make that change by someone who knew about the disclosure, or how a case grade change might suggest sinister motives. CAP offers no evidence that Goehausen knew about the wrongful disclosure of CAP's application or that such knowledge, if it existed, affected her in any way. CAP offers no evidence of whether Goehausen's changes to Herring's draft were atypical for that sort of letter. Finally, CAP offers no motive for the IRS to make things more complicated for CAP in the wake of wrongfully disclosing its Form 1024.

On the record presented, no reasonable trier of fact could infer from CAP's telling of the story that the IRS expanded its request for additional information because of the wrongful disclosure. Absent that causal link, Smith's attorneys' fees incurred in responding to the request for additional information may not be claimed as actual damages.

2. <u>Time Spent by Smith in His Role as Chairman</u>

a. *Smith's Time Spent Responding to the Request for Additional Information*

CAP claims that Smith spent 15 hours working on the IRS's request for additional information in his role as CAP's Chairman rather than as its attorney. (ECF 43-7 at 1; Plaintiff's Response ¶ 56(a).) CAP valued Smith's time as chairman at $200 per hour, for a total claim of $3,000. (ECF 43-7 at 1.) However, as discussed immediately above, no reasonable trier of fact could conclude that time spent responding to the request for additional information was caused by the wrongful disclosure. Thus, CAP may not claim this $3,000 as actual damages.

b. *Smith's Interactions with the Media*

CAP also claims $2,300 in damages based on Smith's 11.5 hours interacting with the media. (Defendant's Facts ¶ 60; ECF No. 43-7 at 1–2; ECF No. 46 at 25.) Drawing on Smith's deposition testimony, CAP explained Smith's actions and motives as follows:

> a. The *ProPublica* articles included CAP alongside "dark money" groups, and the author's perspective was that CAP was secretive and shady, which generally harmed its reputation.
>
> b. The *ProPublica* articles harmed CAP's reputation by labeling it as an organization "that was under the watchful eye of the IRS."
>
> c. As a result of the Disclosure and subsequent articles by *ProPublica*, CAP was highlighted as being under "intense IRS scrutiny" resulting in a general hesitancy for funding sources to invest in the organization.
>
> d. Smith's participation in media interviews was also to prevent further harm to CAP's reputation; to try to correct the record and protect CAP's reputation.

(Plaintiff's Response ¶ 59 (citations omitted).) Assuming Smith testifies consistently with the foregoing at trial and his testimony is credible, the time he spent (and its dollar value) are similar to the damage control expenses that *NOM* allowed as actual damages. *See* 24 F. Supp. 3d at 528–29 (discussing the "$46,086.37 in attorneys' fees expended during [the plaintiff's] efforts to determine the source of the disclosure and prevent further dissemination of its [donor list]"). On their face, then, CAP's claim for $2,300 based on Smith's damage control time appears compensable as actual damages.

The IRS admits that Smith testified as described here, but it denies Smith's

characterization of the ProPublica media coverage, and it denies that any evidence exists to confirm reputational harm or donor hesitancy. (Defendant's Response ¶ 59.) The Court, however, is not convinced that this question turns on whether Smith's perception of the ProPublica coverage was correct from some sort of objective standard, nor on whether evidence of actual reputational harm exists.

The IRS really raises a disputed factual question going to the reasonableness of Smith's damage control efforts on behalf of CAP. *See* Restatement (Second) of Torts § 919 (allowing compensation for "expenditures reasonably made" to avert further harm). "The factors that determine whether the plaintiff was reasonable in taking steps to avert harm and the extent to which he can recover for efforts made or expense incurred are the same as those determining whether a person has been reasonable in his conduct towards others." *Id*. cmt. b (cross-referencing reasonableness factors set forth in Restatement (Second) of Torts §§ 289–96). Moreover, "[t]he viewpoint of the victim at the time when action is necessary and the length of time that he has for decision are properly considered." *Id*.

On this record, sufficient evidence exists from which a reasonable trier of fact could conclude that Smith acted reasonably when he spent time on CAP's behalf (worth $2,300) interacting with the media to prevent further perceived harm to CAP. The ProPublica article does not directly associate CAP with "dark money" or state that it was under "intense IRS scrutiny," but Smith's perceptions are within what a trier of fact could find to be reasonable. For example, the article is labeled as part of series on "Buying Your Vote [¶] Dark Money and Big Data." *See* May 13 Article. It also speaks of what some nonprofit groups claimed to be "overly intrusive questionnaires" from the IRS.

(*Id.*) The IRS points out, correctly, that the article lists CAP as a group that honestly informed the IRS of its intent to spend money on politics, unlike many other organizations that said they would not do so but did anyway. *See id*. This could, of course, shed a positive light on CAP, but that inference is not sufficient to deem unreasonable as a matter of law CAP's perception of a need to perform damage control.

The Court also appreciates the IRS's contention that CAP's Form 1024 became lawfully public in July 2013. (ECF No. 43 at 15–16.) However, CAP has raised a triable issue of fact about the continuing effect of the May 13 Article and, for example, its perceived association of CAP with "dark money." The July 2013 approval may influence the Court's analysis as part of the testimony presented at trial, but it does not dictate judgment as a matter of law on this record.

The Court must resolve an additional wrinkle, however, before determining that a trial is actually warranted. The undisputed evidence shows that Smith's $2,300 compensation for damage control was part of about $19,000 paid to him in late January 2013 for his services as CAP Chairman—*after* CAP learned of the wrongful disclosure but *before* ProPublica published the May 13 Article that prompted Smith's alleged damage control efforts. (Defendant's Facts ¶ 68; Plaintiff's Response ¶ 68; ECF No. 46-18 ¶ 13.) CAP's board of directors, which authorized the $19,000 payment, claims that the payment was both for services in 2012 and in contemplation of services Smith was directed to perform in 2013 to minimize perceived harm done by the wrongful disclosure. (ECF No. 46-18 ¶ 17; ECF No. 46-20 ¶¶ 7–8; ECF No. 46-21 ¶¶ 7–8.) The IRS denies this, apparently because it does not believe that CAP in January 2013 could

have contemplated the services Smith eventually performed. (Defendant's Response ¶ 68(b).)

A material fact issue exists here requiring a trial. Specifically, CAP has presented sufficient evidence from which a reasonable trier of fact could conclude that CAP paid Smith in January 2013 in anticipation of damage control services likely to be performed in the coming year. Assuming the Court credits CAP's evidence in this regard upon hearing it as live testimony, the Court could also reasonably conclude that Smith incurred the $2,300 in reasonable efforts to avert harm. Accordingly, summary judgment is denied as to the $2,300 claimed for Smith's time spent interacting with the media.

c. *Smith's Trip to Washington, D.C.*

CAP's final claim for actual damages derives from a trip Smith took to Washington, D.C. in September 2013, four months after the ProPublica article. (Defendant's Facts ¶¶ 42, 63.) CAP claims $529.80 for Smith's airfare, $552.22 for his lodging, and $771.10 for meals, transportation, and baggage fees. (ECF No. 43-7 at 2.)

Smith's description of what he did on this trip is somewhat vague:

> **Q.** What was the purpose of that trip to Washington, D.C.?
>
> **A.** I went out to meet both with Congressional staff for the Oversight Committee which I knew was conducting an investigation into the IRS's Tea Party scandal, and I believe at that time also was conducting investigation into these disclosures, to the extent that there's a difference and also to meet with consultants that I had worked with who, you know, helped secure funding for us in the past, to try and massage any fears that they had about our organization not being an appropriate recipient of funding.

**Q.** Okay. How did those meetings come about? Like how were they arranged or set up?

**A.** I instigated them.

* * *

**Q.** And I think you said the consultants that you met with were fund-raising consultants; is that correct?

**A.** Yeah. That was part of their role.

**Q.** What other role did they have?

**A.** They often would help—well, they were a full-service—excuse me. A full-service consulting shop, so they would provide guidance on expenditures, on polling results, on whether to conduct polling, on, you know, any sort of operations that you can probably think of for either political organizations or nonprofit groups who, you know, wanted to speak publicly.

* * *

**Q.** . . . How did those discussions [with consultants] relate to the disclosure of CAP's 1024 application . . . ?

**A.** Right. Because—because our application was disclosed, it highlighted our organization as one that was under intense IRS scrutiny. And because of that, it was my sense that there was a general hesitancy to invest in our organization moving forward, in the same way that you would be hesitant to invest in any business that's being perhaps audited by the IRS.

Why would you take the risk of becoming intertwined with that organization and, you know, jeopardize your own whatever—involvement. And so that came up repeatedly.

It also came up in the context of, you know, was the disclosure something that we would be able to fundraise for, to the extent that we were going to need money to defend against lawyers from the IRS.

(ECF No. 43-1 at 15–16, 17, 19.)

The IRS points out that Smith treated some of these consultants to a meal costing $499.10, which is part of the $771.10 CAP claims for meals and other expenses. (ECF No. 43-9 at 1.) The IRS generally challenges the entire trip to D.C. as not proximately caused by the wrongful disclosure. (ECF No. 43 at 20.)

"The idea of proximate cause, as distinct from actual cause or cause in fact, defies easy summary. . . . Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct." *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014). As it was in *NOM*, it was reasonably foreseeable to the IRS that CAP would take damage control efforts when faced with an unlawful disclosure of its tax information. *See NOM*, 24 F. Supp. 3d at 530. A trier of fact could conclude, based on Smith's testimony, that CAP viewed Smith's trip as part of those damage control efforts, at least to the extent Smith was seeking to allay donor fears.

A further question is whether CAP's "effort[s] [in D.C.] to avert further harm" were "reasonable" in the sense of something that a reasonable person would do to avert harm, as well as reasonable in cost. Restatement (Second) of Torts § 919(2). As already noted, reasonableness must be judged according to, among other things, "[t]he viewpoint of the victim at the time when action is necessary and the length of time that he has for decision." *Id*. cmt. b. Under this standard, there is sufficient evidence from which a trier of fact could conclude that Smith's efforts in D.C. were the sort of thing a reasonable person would do to avert harm. As to cost, this is a much closer call. However, the Court does not believe the case is so one-sided that the issue can be decided as a matter of law, without the benefit of live testimony. Accordingly, the Court

denies summary judgment on the expenses CAP claims for Smith's D.C. trip.

3. Summary

The Court finds that CAP may argue at trial for actual damages of up to $4,819.78. Specifically, CAP may claim $33.33 for Smith's attorney time on 12/17/2012; up to $633.33 for Smith's attorney time billed on 5/14/2013 (depending on how much of it related to the call from the IRS); up to $2,300 for Smith's time as CAP Chairman performing damage control with the media; and up to $1,853.12 for Smith's D.C. trip.

**B. Punitive Damages**

As noted previously, 26 U.S.C. § 7431(c)(1)(B)(ii) authorizes punitive damages for "a willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence." CAP seeks punitive damages on top of its actual damages, but only under a gross negligence theory. (ECF No. 43-7 at 2; ECF No. 46 at 31–39.) The IRS claims that CAP cannot demonstrate gross negligence as a matter of law. (ECF No. 43 at 24–30.)

In the § 7431(c) context, "[c]onduct that is grossly negligent is that which is . . . marked by wanton or reckless disregard of the rights of another." *Barrett v. United States*, 100 F.3d 35, 40 (5th Cir. 1996) (internal quotation marks omitted). CAP proposes three theories under which this standard is allegedly satisfied. The Court will discuss each in turn.

1. Brown's General Carelessness

CAP first argues that Brown's actions when handling the ProPublica request show gross negligence:

> . . . concerned that the unusually large Request was the first media request she was assigned, [and] aware that it was 'kind of scary' because it was a rush job and going out to media, Brown unnecessarily accessed the TEDS database, failed to look for any indication as to whether CAP's Application was approved and didn't pay attention when later checking the EDS database.

(ECF No. 46 at 32–33.) Assuming the truth of these claims and CAP's characterization of them, no gross negligence is evident. This is, at best, simple carelessness typical of rushed circumstances.

2. Brown's Failure to Ask Someone Else to Review Her Work

CAP next claims that Brown had a duty to ask someone else to review the response she intended to send to ProPublica. (*Id*. at 33.) In support of this theory, CAP cites *Ward v. United States*, 973 F. Supp. 996 (D. Colo. 1997). *Ward* involved multiple unauthorized releases of taxpayer information. *Id*. at 1000–01. This Court held that certain of those releases were not grossly negligent because the IRS employees at fault had received incorrect advice about the legality of releasing the information in question. *Id*. One release by an IRS employee named James Scholan, however, was grossly negligent. *Id*. at 1001. CAP claims that the difference between Scholan and the other employees was his failure to seek counsel about the propriety of his disclosure. (ECF No. 46 at 34.) Although this Court certain noted that failure, it did not announce it as the sole reason for finding Scholan's disclosure grossly negligent. Rather, the Court noted other factors as well, including that Scholan's trial testimony contradicted his written testimony in numerous respects, that Scholan had sufficient training to know that his disclosure likely would not be permissible, and that he went

ahead apparently not caring about the consequences. *Id*. at 1001. All of that combined indeed appears to support a gross negligence finding, but it is not analogous to Brown's behavior in this case.

Nonetheless, the Court will accept for argument's sake that having a good faith basis for believing disclosure is appropriate (such as through advice which turns out to be erroneous) is an important part of a gross negligence analysis. CAP points to two other cases presenting somewhat similar circumstances. *See Huckaby v. U.S. Dep't of Treasury*, 794 F.2d 1041, 1050 (5th Cir. 1986) (disclosure made under supposed authorization from taxpayer not grossly negligent); *Smith v. United States*, 730 F. Supp. 948, 955 (C.D. Ill. 1990) (disclosure made on advice of senior officials not grossly negligent), *rev'd on other grounds*, 964 F.2d 630 (7th Cir. 1992). But the rule CAP attempts to establish still does not fit this case. The Court agrees with the IRS that *Ward*, *Huckaby*, and *Smith* all involved "a *question* as to whether it was permissible to disclose the particular confidential information at issue. Here, in contrast, Brown *knew* what information could and could not be disclosed, but made an error." (ECF No. 47 at 15 (emphasis in original).) In other words, there was no advice that Brown could have sought; CAP's Form 1024 was, at the time, unquestionably confidential.

To the extent CAP claims that some sort of quality control process should have been in place to review Brown's work, CAP does not dispute the IRS's assertion that it had a process since 2010 for randomly spot-checking responses to information requests from the public. (ECF No. 43 at 29–30.) The fact that Brown's response did not get randomly selected does not show that the process was so deeply flawed as to

create "wanton or reckless disregard of the rights of another." *Barrett*, 100 F.3d at 40 (internal quotation marks omitted). As was the case in *NOM*, "no reasonable [trier of fact] could conclude that the procedures in place were so fundamentally flawed as to constitute gross negligence." 24 F. Supp. 3d at 526. Thus, the Court finds no gross negligence in any failure to have Brown's work double-checked before disclosure.

3. <u>The Transition of Media Requests to the Washington, D.C., Office</u>

Finally, CAP argues that the IRS's "confused" transition from handling media requests in Cincinnati to handling them in Washington, D.C., was grossly negligent. (ECF No. 46 at 35–37.) CAP tells an extremely detailed story involving perhaps a dozen IRS employees with communications lines crossing and proverbial balls being dropped, at least with respect to communicating the new policies and new lines of authority. (Plaintiff's Additional Facts ¶¶ 1–45.) But CAP does not argue that the IRS's transition created gaps in the response process that necessarily would lead to erroneous disclosure of confidential information. Rather, as best as the Court can discern, CAP's argument appears to be that, had the transition been completed as intended, either Brown would not have handled ProPublica's request or at least her response would have been further vetted since ProPublica was a media organization.

The Court sees no gross negligence here. First, taking steps to ensure that Brown personally does not receive media requests is not something the IRS is required to do to avoid gross negligence. Despite thousands of requests, she and her supervisor cannot recall a single wrongful disclosure other than the one to ProPublica. (Defendant's Facts ¶¶ 33–36.) CAP does not challenge this. (*See* Plaintiff's Response ¶¶ 33–36.) Second, the fact that the IRS intended to implement more scrutiny for

media requests does not mean that the lack of it in this instance (even due to communications lines crossing) created gross negligence. As previously discussed, Brown's department had a quality control process, and the Court has already concluded that its failure to catch this wrongful disclosure in this instance does not support a gross negligence finding. Accordingly, CAP's claim for punitive damages fails as a matter of law.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The Motion for Summary Judgment by the United States (ECF No. 43) is GRANTED IN PART and DENIED IN PART as stated in this order; and
2. This matter REMAINS SET for a three-day bench trial beginning October 19, 2015, with a Final Trial Preparation Conference at 2:00 p.m. on October 2, 2015 in Courtroom A801.

Dated this 6th day of May, 2015.

BY THE COURT:

William J. Martínez
United States District Judge